**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAVIER GONZALEZ-LOZA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19 C 3046** |
| | ) | |
| **MIKE DOWNEY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| -------------------------------------------------- | ) | |
| **JAVIER GONZALEZ-LOZA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 3607** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Javier Gonzalez-Loza fell at the Dirksen Federal Courthouse in Chicago while he was in the custody of the U.S. Marshals Service after being arraigned on federal criminal charges. He alleges that four officers forced him to walk down a hazardous staircase without assistance while he was in full restraints (i.e., handcuffs and leg shackles), causing his fall and resulting injuries. He further asserts that the officers at the scene and officials at the Jerome Combs Detention Center (JCDC) in Kankakee, Illinois failed to provide adequate medical care after the accident.

Gonzalez-Loza has filed two lawsuits. In the first suit, he advances constitutional claims under 42 U.S.C. § 1983 against Kankakee County Sheriff's Officers Robert

Bartucci and Eric Senesac, JCDC Medical Director Dr. Jeffrey Long, Kankakee County Sheriff Mike Downey, and Kankakee County (the Kankakee defendants). In the second suit, he asserts four claims under the Federal Tort Claims Act, 28 U.S.C. § 2674, against the United States. The Kankakee defendants and the U.S. government filed motions for summary judgment on all claims. For the reasons below, the Court denies summary judgment on one of Gonzalez-Loza's claims against two of the Kankakee defendants and on one of his claims against the United States; defers ruling on a second claim against the United States; and otherwise grants the defendants' motions for summary judgment.

## Background

### A. The fall

The following facts are undisputed unless otherwise noted. Gonzalez-Loza was detained at JCDC while awaiting a federal criminal trial. Gonzalez-Loza alleges that he speaks only Spanish; the Kankakee defendants and the U.S. government dispute this. On July 17, 2018, Kankakee County Sheriff's Officers Robert Bartucci and Eric Senesac transported Gonzalez-Loza and five other detained men from JCDC to the Dirksen Federal Courthouse in Chicago for court proceedings. The U.S. Marshals Service (USMS) is responsible for "escort[ing] the prisoners and detainees into the courthouse, to the Dirksen cellblock, then to and from courtrooms for appearances, before escorting them back to their transport vehicles." U.S. Stmt. of Material Facts ¶ 2. The Kankakee County Sheriff's Office assists with these tasks when necessary. Under USMS policy, pretrial detainees must wear handcuffs and leg shackles.

When they arrived at the courthouse, Senesac and Bartucci accompanied

Gonzalez-Loza and the other detained men up a flight of six stairs. Two Deputy U.S. Marshals, Marlon Burton and Lorne Stenson, were also present. Although the detained men were restrained, no officer physically assisted them up the stairs. The deputy marshals and the Kankakee officers testified that on several previous occasions, they had gone up and down the stairs to accompany detainees and for other purposes without incident. The Kankakee defendants do not dispute that there was a protruding "piece of metal" on the staircase and that they knew about this condition. *See* Kankakee Defs.' Stmt. of Material Facts ¶ 17; U.S. Stmt. of Material Facts, Ex. 3 (Bartucci Dep.) at 46:21–48:1 (testifying that he noticed a protruding metal piece on one of the stairs on July 17, 2018, and that "[i]t was that way for a while"); U.S. Stmt. of Material Facts., Ex. 4 (Senesac Dep.) at 30:6–30:11 (testifying that he noticed that "there was rough edges on the metal" on the stairs). The United States denies that Burton or Stenson had any knowledge of a protruding piece of metal on the stairs.

After Gonzalez-Loza's court appearance, the deputy marshals and Kankakee officers accompanied him and others out of the courthouse via the same route through which they had entered. As the restrained men descended the six-step staircase, the Kankakee officers were waiting ahead by the transport van while the two marshals were behind the men at the top of the staircase. In other words, the prisoners were on their own while descending the stairs. The Kankakee defendants do not dispute that, as Gonzalez-Loza was walking down the stairs, "his leg chain snagged on a piece of metal" and "[h]e fell and landed face-downward at the base of the stairs." Kankakee Defs.' Stmt. of Material Facts ¶ 17. The United States admits that Gonzalez-Loza fell but disputes that the fall was caused by his leg chain snagging on metal. Deputy

3

Marshal Burton "rushed to check on Gonzalez-Loza, and moved Gonzalez-Loza to a chair with assistance from Deputy [Marshal] Stenson." *Id.* ¶ 19; U.S. Stmt. of Material Facts ¶ 20. Gonzalez-Loza alleges, but the defendants dispute, that he told the marshals not to touch him. Gonzalez-Loza asserts that he suffered "a head injury and injuries to his neck, shoulders and back." Pl.'s Resp. to Kankakee Defs.' Stmt. of Material Facts ¶ 20. The defendants dispute the extent of his injuries, but they agree that, at a minimum, Gonzalez-Loza was injured as a result of the fall. *See* Kankakee Defs.' Stmt. of Material Facts ¶ 20 (admitting that Gonzalez-Loza suffered "a little bleeding from abrasions to his ankles and wrists from the fall and some bruising to his arms and legs"); U.S. Stmt. of Material Facts ¶ 23 (admitting that he "sustained minor scratches and redness to his left and right hands and arms, and left knee"). Deputy Marshal Stenson called Nurse Pat Sullivan[1] to examine Gonzalez-Loza. Within approximately ten minutes, Nurse Sullivan arrived and "cleaned his cuts and scrapes, applied anti-bacterial ointment, and gave him 400 mg of Motrin for pain." Kankakee Defs.' Stmt. of Material Facts ¶ 22; U.S. Stmt. of Material Facts ¶ 22 (stating that Nurse Sullivan "rendered medical attention and aid to Gonzalez-Loza, including providing Motrin"). She stated that Gonzalez-Loza was cleared for transport back to JCDC. Bartucci and Senesac were instructed, either by Sullivan directly or by Stenson, to inform JCDC medical staff about the fall. Gonzalez-Loza then boarded the van, and Bartucci and Senesac transported him back to JCDC.

---

[1] Sullivan is not a USMS employee; her exact employment status is unclear. U.S. Stmt. of Material Facts ¶ 22.

**B.      Subsequent medical treatment at JCDC[2]**

On the way back to JCDC, Gonzalez-Loza vomited two or three times.  When they arrived at the jail, the officers brought Gonzalez-Loza to the healthcare unit, where he was seen by a nurse who is not named as a defendant.  The nurse "observed mild abrasions, which she cleaned, sterilized, and covered with a band-aid, but he was not bleeding.  She gave [Gonzalez-Loza] an ice pack and Motrin and scheduled him to see a mid-level provider the next day."  *Id.* ¶ 28.  Gonzalez-Loza says that the nurse did not speak Spanish and did not request an interpreter, and as a result he could not communicate his symptoms to her.  Pl.'s Resp. to Kankakee Defs.' Stmt. of Material Facts ¶ 28.  Over the following weeks and months, Gonzalez-Loza says, he continued to experience significant back pain.  He was seen by various healthcare providers at JCDC who prescribed different medications in response to his complaints of back pain, including Tylenol, ibuprofen, cyclobenzaprine (a muscle relaxer), and prednisone (an oral steroid).

Dr. Jeffrey Long, the JCDC Medical Director, did not personally treat Gonzalez-Loza but reviewed his medical file and did not note any "alarm [sic] symptoms" that would indicate that more serious treatment, such as spinal surgery or an outside referral, might be necessary.  Kankakee Defs.' Stmt. of Material Facts ¶ 36.  About a

---

[2] For purposes of resolving the present motions for summary judgment, the facts surrounding Gonzalez-Loza's medical care at JCDC are relevant only to the claims against the Kankakee defendants.  Therefore, at this stage, the Court will rely only on the statements of material fact in that case and will not consider the United States's position regarding these facts.  The Court notes, however, that the matters regarding Gonzalez-Loza's medical care at JCDC may well be relevant regarding damages on Gonzalez-Loza's claims against the United States.

month later, in response to Gonzalez-Loza's continued complaints, a physician's assistant ordered an x-ray "to rule out any fracture or other bone injury" despite "not seeing evidence of nerve damage or acute injury."  *Id.* ¶ 38.  The parties agree that the x-ray "showed no evidence of acute injury (e.g. from a fall)."  *Id.* ¶ 39.  Dr. Long reviewed the x-rays and "had no concerns about the care provided."  *Id.* ¶ 40.

Gonzalez-Loza continued to complain about back and leg pain during September visits to JCDC's healthcare unit.  In response, a non-defendant provider prescribed him "Nabumetone, a stronger NSAID pain reliever."  *Id.* ¶ 41.  In November, after another consultation, Gonzalez-Loza was prescribed an even stronger pain medication, Tramadol, and was referred for a physical therapy consultation.  *Id.* ¶ 43.  "Tramadol is an opiate-like pain reliever that is subject to abuse, and thus prescribed in the JCDC rarely, only after other medications have failed to resolve pain complaints."  *Id.* ¶ 44.  In December, Gonzalez-Loza was seen by a physical therapist who recommended only a "home exercise program rather than a more intensive plan (e.g. weekly outpatient visits)."  *Id.* ¶ 52.

Gonzalez-Loza alleges that, due to a language barrier, he could not communicate with medical providers at any of these visits except on rare occasions when interpretation was provided; the defendants dispute the extent of the language barrier and the availability of interpretation services.  Gonzalez-Loza admits that a "language line"—that is, a phone line with an interpreter—existed to provide interpretation services, but he says that the medical staff rarely used that resource.  Pl.'s Resp. to Kankakee Defs.' Stmt. of Material Facts ¶ 33.  In February 2019, Gonzalez-Loza was permanently transferred out of JCDC to a different correctional facility.  He

alleges that he continues to suffer from back pain.

## C. The lawsuits

Gonzalez-Loza filed suit under section 1983 against Bartucci, Senesac, Dr. Long, Sheriff Downey, and Kankakee County. He alleges that Bartucci and Senesac violated the Due Process Clause of the Fourteenth Amendment by knowingly subjecting him to a dangerous condition—navigating the stairway while restrained—and by failing to provide him with adequate medical care after his fall. He also alleges that Dr. Long and Sheriff Downey violated the Fourteenth Amendment by failing to provide him with adequate medical care during the period that he was held at JCDC. Gonzalez-Loza filed a separate lawsuit under the FTCA against the United States, alleging that the government is liable for the tortious conduct of Deputy Marshals Burton and Stenson. The defendants in both cases have moved for summary judgment on all claims.

## Discussion

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court must "construe all facts and inferences in favor of the nonmoving party." *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015).

## A. Section 1983 claims against Kankakee defendants

The Court will first address Gonzalez-Loza's section 1983 claims against the Kankakee defendants.

1.    **Failure to protect**[3]

Gonzalez-Loza argues that Senesac and Bartucci violated his constitutional rights when they failed to take reasonable action to protect him from the risk of harm he faced as he descended the stairs in restraints.  "[T]o state a viable failure-to-protect claim under the Fourteenth Amendment, a pretrial detainee must allege:  (1) the defendant made an intentional decision regarding the conditions of the plaintiff's confinement; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's inaction obvious; and (4) the defendant, by not taking such measures, caused the plaintiff's injuries." *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022).

Viewing the record in the light most favorable to Gonzalez-Loza, a reasonable jury could conclude that Senesac and Bartucci failed to protect him from a substantial risk of serious harm.  First, a jury could conclude that Senesac and Bartucci made an intentional decision regarding the relevant conditions that led to Gonzalez-Loza's fall. Both officers were present as part of the team escorting him through the courthouse. Both officers knew from prior experience that Gonzalez-Loza would descend the stairs

---

[3] Gonzalez-Loza's complaint and response brief refer in passing to an excessive force claim against the Kankakee defendants.  But he does not elaborate on this contention, nor does he identify any facts that could support an excessive force claim against the defendants.  He does not contend, for example, that the officers' use of restraints itself amounted to excessive force.  Instead, Gonzalez-Loza alleges that the officers failed to take appropriate action to protect him from a known dangerous situation.  These facts are more appropriately characterized as a failure-to-protect claim.

without assistance while restrained. The officers argue that they had "[nothing] to do with the maintenance of the federal courthouse or the manner in which Gonzalez-Loza was shackled." Kankakee Defs.' Mem. in Supp. of Summ. J. at 1. But there is evidence that Senesac and Bartucci had the authority to assist Gonzalez-Loza down the stairs if they had chosen to do so. *See* U.S. Stmt. of Material Facts, Ex. 4 (Senesac Dep.) at 24:10–24:17 ("I would have had authority to assist in walking people up. As far as going up the staircase."). This is sufficient to permit a reasonable jury to find that the officers could have assisted Gonzalez-Loza down the stairs (or requested that one of the Marshals assist him) but chose not to do so.

Second, a reasonable jury could conclude that Gonzalez-Loza's restraints, combined with the condition of the staircase, posed a "substantial risk" of "serious harm." *Thomas*, 39 F.4th at 841. The officers do not dispute that there was a piece of metal protruding from the staircase and that they knew about this condition. *See* U.S. Stmt. of Material Facts, Ex. 3 (Bartucci Dep.) at 46:21–48:1 (stating that he noticed a protruding metal piece on one of the stairs on July 17, 2018, and that "[i]t was that way for a while"); U.S. Stmt. of Material Facts, Ex. 4 (Senesac Dep.) at 30:6–30:11 (stating that he noticed that "there was rough edges on the metal" on the stairs). Further, it is undisputed that Gonzalez-Loza's hands and legs were restrained with chains. It is not difficult to see how this combination could lead to serious injury. *See Anderson v. Morrison*, 835 F.3d 681, 683 (7th Cir. 2016) ("Forcing someone to walk handcuffed and unaided down stairs needlessly strewn with easily removable milk, food, and garbage . . . poses an unreasonable peril.").

Third, a reasonable jury could find that neither Senesac nor Bartucci took

9

"reasonable available measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's inaction obvious." *Thomas*, 39 F.4th at 841. Again, there is evidence that the officers knew about the metal on the staircase as well as the danger it posed and that they had the ability to assist the detainees on their way down the staircase or inform the marshals about the issue and thus prevent the resulting harm. A reasonable jury could find that these are simple and reasonable steps that would have abated the risk. Yet the record indicates that the officers did not do that or anything else to mitigate the risk.

The officers argue that they "had no reason to worry or sound the alarm" because they "had seen detainees restrained in the same manner" use the stairs "many times." Kankakee Defs.' Mem. in Supp. of Summ. J. at 7–8. But the mere fact that disaster had been avoided on previous occasions does not mean that, as a matter of law, there was no risk or that a reasonable officer would not have recognized that risk. Rather, these are facts that a jury could take into account in pointing against a finding of liability. Moreover, under the Fourteenth Amendment's objective reasonableness standard, the officers' *subjective* perception of the risk posed is not the governing consideration. *See McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) ("[A] pretrial detainee must prove only that the defendant's challenged conduct was *objectively* unreasonable; he need not also demonstrate, as the Eighth Amendment requires, that the defendant was *subjectively* aware that his conduct was unreasonable." (emphasis in original)). Thus, the officers' subjective belief that there was "no reason to worry," even if credited, is insufficient to defeat Gonzalez-Loza's claim on summary judgment.

10

Lastly, a reasonable jury could conclude that the officers' failure to take any reasonable measures to mitigate the risk posed to Gonzalez-Loza by the dangerous condition on the stairs caused his injury. The officers do not dispute that Gonzalez-Loza "fell and landed face-downward at the base of the stairs" because "his leg chain snagged on a piece of metal." Kankakee Defs.' Stmt. of Material Facts ¶ 17. A jury could reasonably infer that, had an officer assisted Gonzalez-Loza down the stairs, the fall would have been avoided. The defendants do not dispute this straightforward proposition.

In sum, Gonzalez-Loza has provided sufficient evidence from which a reasonable jury could conclude that Senesac and Bartucci failed to protect him from a dangerous condition in violation of the Fourteenth Amendment.

The defendants argue in the alternative that they are entitled to qualified immunity. But they have made no effort to develop the argument apart from stating that "[f]or sake of efficiency, this brief will adopt, rather than repeat, the arguments above." Kankakee Defs.' Mem. in Supp. of Summ. J. at 13. Read literally, this statement indicates that the defendants argue only that they are entitled to qualified immunity because Gonzalez-Loza has not presented sufficient evidence of a violation of his constitutional rights. The Court has already denied summary judgment on that ground because there are genuine disputes of material fact, as discussed above. To the extent that the defendants seek to argue that the constitutional right at issue here was not clearly established, the only substantive caselaw that the defendants cite relates to Gonzalez-Loza's claim for inadequate medical care, not his failure-to-protect claim. "Arguments that are underdeveloped, cursory, and lack supporting authority are

waived." *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020). That is the case here.

Even if the defendants had not waived this defense, the Court would conclude that they are not entitled to qualified immunity. An incarcerated person has a clearly established right "to be free from physical harm" and "under section 1983 they may sue jail or prison staff who fail to protect them." *Thomas*, 39 F.4th at 841. "Such a claim brought by a pretrial detainee arises under the Due Process Clause of the Fourteenth Amendment, whereas a convicted inmate's claim arises under the Eighth Amendment's ban on cruel and unusual punishment." *Id.* Although "[p]risons are not required to provide a maximally safe environment . . . they must address easily preventable, observed hazards that pose a significant risk of severe harm to inmates." *Anderson*, 835 F.3d at 683. The Seventh Circuit has applied this clearly established right in "a reasonably analogous case" with "a factual circumstance similar to the one at hand." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). In *Anderson v. Morrison*, the Seventh Circuit held that a plaintiff stated an Eighth Amendment claim where he alleged that prison officials "handcuffed [him] behind his back and ordered him to walk down a set of stairs . . . covered [with] food, milk, and other garbage" without assistance. 835 F.3d at 682 (internal quotations omitted). The court concluded that the plaintiff had "alleged circumstances perilous enough to constitute 'an unreasonable risk of serious damage to his future health.'" *Id.* at 683 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). Specifically, the court pointed to three conditions that contributed to an unreasonable risk sufficient to state an Eighth Amendment claim: (1) the hazardous condition of the stairs, (2) the fact that "by handcuffing him behind his back, the guards

12

prevented [the plaintiff] from steadying himself to avoid tripping, slipping, or tumbling down the flight of stairs," and (3) the guards' refusal to assist the plaintiff down the stairs. *See id.* at 682–83.

These risk factors are very similar to the conditions that Gonzalez-Loza argues were present when he fell. The stairs were hazardous because of the protruding metal piece, he was heavily restrained, and he was unaided. Although *Anderson* involved an Eighth Amendment claim, that is immaterial; the duty imposed on jailers under the Fourteenth Amendment with regard to pretrial detainees is *more* demanding than imposed on prison officials under the Eighth Amendment. *See Stockton v. Milwaukee County*, 44 F.4th 605, 614 n.3 (7th Cir. 2022) ("[T]he standard for pretrial detainees [to establish a claim] . . . is lower than that for post-conviction prisoners proceeding under the Eighth Amendment."). The Court therefore concludes that the officers are not entitled to qualified immunity.

### 2. Inadequate medical care

Gonzalez-Loza also asserts that the Kankakee defendants failed to provide him with proper medical treatment in the aftermath of his fall. Under the Fourteenth Amendment, jail officials have a constitutional obligation to provide adequate medical care to those detained in their custody. *McGee*, 55 F.4th at 569. "[T]he controlling inquiry for assessing a due process challenge to a pretrial detainee's medical care proceeds in two steps." *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018). First, the plaintiff must show that "the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case." *Id.* For example, evidence that a doctor "forgot to take over coverage

for [another doctor] when he went on vacation" or "mixed up [the plaintiff's] chart with that of another detainee" would amount only to "negligence . . . insufficient to support liability under the Fourteenth Amendment." *Miranda v. County of Lake*, 900 F.3d 335, 354 (7th Cir. 2018). Evidence that a doctor "deliberately chose" a certain course of treatment, in contrast, would be sufficient to satisfy the first step. *Id.* Second, the plaintiff must show that the defendants' conduct was objectively unreasonable. *Id.* "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann*, 909 F.3d at 886. In addition, the plaintiff must show that the "allegedly inadequate care caused him harm." *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 679 (7th Cir. 2023).

### a. Senesac and Bartucci

Gonzalez-Loza argues that Senesac and Bartucci acted unreasonably when they transported him back to the healthcare unit at JCDC rather than taking him directly to a hospital emergency room. They counter that "[a]s lay officers with only minimal first aid training," they were entitled to defer to Nurse Sullivan's medical judgment that Gonzalez-Loza was cleared for transport back to the jail. Kankakee Defs.' Mem. in Supp. of Summ. J. at 8.

The Seventh Circuit has "long recognized that correctional institutions typically engage in the division of labor between medical professionals and other security and administrative staff." *McGee*, 55 F.4th at 569 (internal quotations omitted). "When detainees are under the care of medical experts, non-medical jail staff may generally

14

trust the professionals to provide appropriate medical attention." *Miranda*, 900 F.3d at 343. But this principle is not without limits. "[I]f jail officials had reason to know that their medical staff were failing to treat or inadequately treating an inmate, liability is possible." *Id.*

It is undisputed that Nurse Sullivan examined Gonzalez-Loza shortly after the fall and "cleaned his cuts and scrapes, applied anti-bacterial ointment, and gave him 400 mg of Motrin for pain." Kankakee Defs.' Stmt. of Material Facts ¶ 22. In addition, it is undisputed that Nurse Sullivan told Bartucci and Senesac that Gonzalez-Loza was "clear" for transport back to JCDC and instructed them to "tell JCDC medical staff about the fall and medication she provided." *Id.* at ¶ 22. Bartucci and Senesac were entitled to rely on Nurse Sullivan's advice unless they had some reason to know that it was inadequate.

Gonzalez-Loza argues that Nurse Sullivan did not speak Spanish and therefore was not qualified to "opine regarding any further care he needed." Pl.'s Resp. at 5. He asserts that the officers therefore cannot justify their reliance on her advice. As an initial matter, Gonzalez-Loza has provided no evidence that the existence of a language barrier rendered Nurse Sullivan unqualified to determine whether he was stable for transport to the JCDC. Nor has he provided evidence that a reasonable officer would have known that Nurse Sullivan could not offer a valid opinion on whether Gonzalez-Loza needed emergency attention based solely on his objective, physical symptoms. A jury therefore could not reasonably find that the officers "had reason to know" that Nurse Sullivan was "inadequately treating" Gonzalez-Loza. *Miranda*, 900 F.3d at 343.

That aside, Gonzalez-Loza has failed to provide any evidence that would permit

a reasonable jury to find the officers' decision to take him back to JCDC for follow-up medical care rather than to an emergency room (1) was unreasonable, or (2) caused him harm. Gonzalez-Loza asserts that he exhibited "warning signs of his need for medical attention" that were "so hazardous as to violate the constitution." Pl.'s Resp. at 6. Specifically, he points to the fact that he vomited in the van on the drive back to JCDC. But he has not supported the contention that this—though perhaps reasonably viewed, in the circumstances, as a sign of a concussion—was indicative of an emergency requiring immediate care at a hospital.

Critically, this is not a case where the officers failed to arrange for *any* medical care. It is undisputed that the officers sent Gonzalez-Loza to JCDC's healthcare unit upon arriving at the jail. Although Gonzalez-Loza argues that the care he received at JCDC was inadequate (a claim the Court addresses below), he has provided no evidence that would permit a reasonable jury to find that Senesac and Bartucci had reason to believe that JCDC's healthcare team could not competently handle his care from that point forward.

Even if adequate medical care is ultimately provided, however, officers nevertheless can be liable if they unjustifiably delayed that care. *See Arce*, 75 F.4th at 679. The only remaining issue, therefore, is whether the officers violated Gonzalez-Loza's constitutional rights by transporting him back to JCDC—which took about one hour—and sending him to JCDC's medical staff for examination rather than taking him directly to a hospital emergency room. "In cases where prison officials delayed rather than denied medical assistance to an inmate, a plaintiff must show that the delay (rather the inmate's underlying medical condition) caused some degree of harm." *Id.* at 680

(internal quotations omitted). Gonzalez-Loza neither argues nor provides evidence "that the . . . gap in medical care caused him some harm that could have been avoided had the follow-up been sooner." *Id.* The officers are therefore entitled to summary judgment on Gonzalez-Loza's inadequate medical care claim.

### b. Dr. Long and Sheriff Downey

Gonzalez-Loza also argues that the care he received at JCDC was constitutionally inadequate due to the staff's "7-month failure to respond to [his] constant complaints of pain." Pl.'s Resp. at 7. He contends, for example, that the jail's medical staff "failed to identify [the] cause of Plaintiff's intense pain," "limited treatment to drug therapy," and failed to provide him with physical therapy. *Id.* at 8–9. He also argues that JCDC medical staff repeatedly failed to use an interpreter throughout the course of his treatment despite the fact that he could not speak English. But Gonzalez-Loza has not sued any of the medical providers who treated him directly. Instead, he has sued Dr. Long (the jail's medical director) and Mike Downey (the Kankakee County Sheriff) on this theory.

To prevail on section 1983 claim, a plaintiff must establish that the defendant "caused or participated in [the] constitutional deprivation." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). "There is no such thing as *respondeat superior* liability for government officials under § 1983." *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021). A supervisor can satisfy this personal participation requirement even without direct, hands-on involvement if the supervisor "know[s] about the conduct and facilitate[s] it, approve[s] it, condone[s] it, or turn[s] a blind eye for fear of what [he] might see." *Id.* at 494.

17

It is undisputed that neither Dr. Long nor Sheriff Downey personally treated Gonzalez-Loza. Gonzalez-Loza argues that Dr. Long is liable because he had "authority to set policies and supervise the mid-level providers at JCDC." Pl.'s Resp. at 8. Specifically, he argues that (1) it should have been obvious to Dr. Long from Gonzalez-Loza's medical records that the treatment he was receiving was inadequate and (2) that Dr. Long knew or turned a blind eye to the fact that his medical staff made little to no effort to communicate with Gonzalez-Loza in Spanish. Similarly, Gonzalez-Loza argues that although Sheriff Downey lacked any personal knowledge about his treatment, the Sheriff "knew that JCDC was receiving an unprecedented number [of] Spanish speakers" but "fail[ed] to ensure JCDC could accommodate monolingual Spanish speakers." *Id.* at 9–10.

On Gonzalez-Loza's first theory, he has not produced any evidence from which a reasonable jury could conclude that a reasonable medical professional in Dr. Long's position would have known that the treatment that Gonzalez-Loza was receiving was inadequate. Gonzalez-Loza admits that the jail's medical staff followed up with him numerous times and repeatedly increased or altered his prescribed medications in response to his complaints of ongoing pain. In addition, the staff arranged for x-rays (which did not suggest any acute injury from his fall), and a visit with a physical therapist (who concluded that regular physical therapy visits were not necessary). Moreover, the medical records contained no indication that would put Dr. Long on notice that the staff who treated Gonzalez-Loza experienced any problems communicating with him.

In light of these undisputed facts, Gonzalez-Loza must provide *something* upon which a jury could base its conclusion that a reasonable person in Dr. Long's position

18

would have taken some other course of action.  Expert testimony is not always required to establish that medical care was inadequate.  *See Miranda*, 900 F.3d at 347; *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("[A] trier of fact can conclude that [a medical professional] knew of the need from evidence that the serious medical need was obvious" and that "the symptoms plainly called for a particular medical treatment," such as the need to set a broken leg. (internal quotations and citation omitted)).  But in this case, nothing in Gonzalez-Loza's medical records, testimony, or any other evidence would permit a jury to find that any facts came to Dr. Long's attention that made his failure to take further action unreasonable.  Gonzalez-Loza does not have a viable claim on this theory.

The Court turns next to Gonzalez-Loza's second theory.  The only evidence that JCDC staff inadequately provided for the needs of non-English speakers is Gonzalez-Loza's testimony that he was treated without an interpreter and Dr. Long's testimony that he wasn't sure that staff always documented when an interpreter was used.  The Court assumes for purposes of discussion that this evidence would be sufficient to permit a reasonable jury to find that that Dr. Long's and/or Sheriff Downey's policies regarding non-English speakers are constitutionally inadequate.  But even if so, the defendants are entitled to summary judgment.  Gonzalez-Loza has not pointed to any evidence that would permit a reasonable jury to find that these shortcomings caused him any harm.  *See Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) ("In order to succeed in a § 1983 suit, a plaintiff must establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages." (internal quotations and citation omitted) (emphasis in

original)).  In particular, Gonzalez-Loza has offered no evidence that would permit a finding that, with better communication opportunities, he would have been provided different care that would have led to a meaningful improvement in his condition.

For these reasons, Gonzalez-Loza's claim against Dr. Long and Sheriff Downey cannot survive summary judgment.

### c.  *Monell* claim

Finally, Gonzalez-Loza sketches out a *Monell* claim against Kankakee County based on Dr. Long and/or Sheriff Downey's role as "an official with final authority to establish municipal policy" with respect to the translation/interpretation services available to the jail's non-English-speaking population.  Pl.'s Resp. at 10–11.  That claim fails for the same reasons just discussed:  Gonzalez-Loza has not provided sufficient evidence that he suffered harm as a result of this alleged policy failure.  *See Arce*, 75 F.4th at 682 (affirming summary judgment on *Monell* claim because "no jury could find that [the plaintiff] was harmed by [the defendant's] policies"); *Gabb*, 945 F.3d at 1035 (affirming summary judgment because the plaintiff did not show that he suffered harm as a result of his medical treatment in prison).

In sum, the Court denies the Kankakee defendants' motion for summary judgment on Gonzalez-Loza's failure-to-protect claim against Senesac and Bartucci for their alleged failure to prevent his fall, but grants summary judgment on the remaining claims against the Kankakee defendants.

### B.  Federal Tort Claims Act claims against the United States

Under the FTCA, the United States can be held liable for torts committed by government employees "in the same manner and to the same extent as a private

individual under like circumstances."  28 U.S.C. § 2674.  Gonzalez-Loza asserts FTCA

claims for negligence, negligent infliction of emotional distress, intentional infliction of

emotional distress, and battery based on the conduct of the two Deputy U.S. Marshals,

Burton and Stenson, who transported him through the courthouse on the day of his fall.[4]

The government argues that (1) Gonzalez-Loza's suit is barred by the FTCA's

discretionary function exception; (2) it is immune from Gonzalez-Loza's FTCA claims

under the Illinois Federal Law Enforcement Officer Immunity Act, 745 ILCS 22/10; and

(3) Gonzalez-Loza has not met his burden of proof on any claim.

### 1.    Discretionary function exception

The government argues that Gonzalez-Loza's claims are barred because the

FTCA does not permit claims "based upon the exercise or performance or the failure to

exercise or perform a discretionary function or duty on the part of a federal agency or an

employee of the Government, whether or not the discretion involved be abused."  28

U.S.C. § 2680(a).  As the government views it, the marshals' decisions regarding the

manner in which Gonzalez-Loza was escorted or transported involved "the exercise or

performance . . . [of] a discretionary function."  *Id.*

To determine whether the discretionary exception applies, courts must ask

whether two requirements are met.  "First, the act involved must be discretionary in the

_____

[4] The United States argues that Gonzalez-Loza asserts two (or possibly three) other claims—for "premises liability" and failure to provide/supervise a safe transfer between JCDC and the courthouse—which are barred because they were not administratively exhausted.  *See* U.S. Mem. in Supp. of Summ. J. at 19–20.  In response, Gonzalez-Loza expressly disclaims any intention of bringing a premises liability claim and does not reference any claim for failure to provide or supervise a safe transfer between JCDC and the courthouse.  The Court therefore considers any such claims waived or abandoned.

sense that it involves an element of judgment or choice."  *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014) (internal quotations omitted).  "Second, 'the exception protects only governmental actions and decisions based on considerations of public policy.'"  *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)).  To prevail on summary judgment, the government bears the burden of "offer[ing] evidence that shows beyond reasonable dispute that its conduct was shielded by the exception."  *Id.*

The first part of the two-step inquiry is satisfied in this case.  The record does not contain evidence of any regulation or policy that specifically required or precluded Burton and Stenson from physically assisting Gonzalez-Loza down the stairs (or asking the Kankakee officers to do so).  Therefore, the choice whether to do so was within their discretion.  But the government has not carried its burden with respect to the second step, at least with respect to Gonzalez-Loza's claims for negligence and negligent infliction of emotional distress.  The Court agrees that, generally speaking, the decisions by USMS personnel regarding how to transport Gonzalez-Loza involved efficiency and safety, which of course are public policy-related.  But the government has not "offer[ed] evidence that shows beyond reasonable dispute" that the specific conduct at issue here—the marshals' choice to send Gonzalez-Loza unassisted down a staircase with a protruding metal piece—was a "decision[ ] based on considerations of public policy."  *Id.* The Seventh Circuit has suggested that this second step requires the government to show that the defendants actually "weighed the relevant considerations in deciding how best to act (or not) in response" to the situation at hand."  *Id.*  If, in contrast, there is evidence that the defendants "simply ignored" a hazard, "forgot about" it, or otherwise "behaved negligently without making a discretionary judgment of the type shielded by

the exception, the discretionary function exception would not apply to their conduct."

*Palay v. United States*, 349 F.3d 418, 431 (7th Cir. 2003); *Keller*, 771 F.3d at 1024.  The

government has not provided evidence establishing that the deputy marshals' choice

not to help Gonzalez-Loza down the stairs was the kind of judgment "grounded in

social, economic, and political policy" that the discretionary function exception protects.

*Gaubert,* 499 U.S. at 323.  In fact, there is some evidence to the contrary.  *See* U.S.

Stmt. of Material Facts, Ex. 1 (Burton Dep.) at 67:8–67:11 ("Q: Was there any

discussion of using an escort system in order for the detainees to access the stairs

going up and down?  A: No."); *Id.* at 68:12–68:15 ("Q: Was there any discussion that

you recall as to safety measures in escorting the detainees in the alternate route?  A:

No.").  The government thus is not entitled summary judgment on this basis.

### 2.    Illinois Federal Law Enforcement Officer Immunity Act

The government also argues that it is entitled to immunity from Gonzalez-Loza's

claims under Illinois law.  The Illinois Federal Law Enforcement Officer Immunity Act

states that a federal law enforcement officer, including a U.S. Marshal, "is not liable for

his or her act or omission in the execution or enforcement of any law unless the act or

omission constitutes wilful [sic] and wanton conduct."  745 ILCS 22/5(a), 22/10.

"FTCA claims are governed by the substantive law of the state where the alleged

tort occurred."  *Kaniff v. United States*, 351 F.3d 780, 790 (7th Cir. 2003) (citing 28

U.S.C. § 1364(b)(1)).  Gonzalez-Loza does not dispute that the Act properly applies to

his FTCA claims.  Rather, he argues that a reasonable factfinder could find that the

deputy marshals' conduct meets the willful and wanton standard.  Therefore, the Court

will apply that standard to determine whether his claims for negligence, negligent

23

infliction of emotional distress, intentional infliction of emotional distress, and battery survive summary judgment.

### 3. Negligence

"Under Illinois law, a plaintiff pleading willful and wanton misconduct must establish the same basic elements of a negligence claim, which are the existence of a duty, breach of that duty, and an injury proximately resulting from the breach. A willful and wanton claim has the additional requirement that the breach be not merely negligent, but with 'conscious disregard for the welfare of the plaintiff.'" *Doe-2 v. McLean Cnty. Unit Dist. No. 5*, 593 F.3d 507, 514 (7th Cir. 2010) (internal citation omitted) (quoting *Ortega-Piron ex. rel. Doe v. Chi. Bd. of Educ.*, 213 Ill. 2d 19, 28, 820 N.E.2d 418, 423 (2004)).

The government does not dispute that the deputy marshals owed a duty to Gonzalez-Loza or that he was injured by the fall. The only remaining issues are whether the deputy marshals' conduct proximately caused his injury and whether a reasonable factfinder could find their conduct was willful and wanton. The Court concludes that these issues involve genuinely disputed facts. First, the government argues that the deputy marshals did not cause his fall because "no one but Gonzalez-Loza is known to have fallen on those stairs." U.S. Mem. in Supp. of Summ. J. at 16. But this is an argument about whether the deputy marshals exercised due care, not an argument about causation. This case does not involve an elaborate causal chain of events. Gonzalez-Loza's contention is simple: the marshals were responsible for his safety, yet they forced him into an unsafe situation that resulted in an injury. A reasonable factfinder could find that, had the deputy marshals physically assisted

Gonzalez-Loza down the steps, he would not have been injured.

Second, as discussed above with respect to the Kankakee officers, there is evidence from which a reasonable factfinder could conclude that the deputy marshals were aware of the protruding piece of metal that caused Gonzalez-Loza's fall. *See* U.S. Stmt. of Material Facts ¶ 15 (stating that the deputy marshals "regularly" used the stairway to transport detained people and to visit the courthouse gym); *See id.*, Ex. 3 (Bartucci Dep.) at 46:21–48:1 (testifying that he noticed a protruding metal piece on one of the stairs on July 17, 2018, and that "[i]t was that way for a while"); *id.*, Ex. 4 (Senesac Dep.) at 30:6–30:11 (testifying that he noticed that "there was rough edges on the metal" on the stairs).

The government argues that the Kankakee officers' testimony that they had previously noticed the protruding metal on the stairs is irrelevant to the deputy marshals' knowledge, but the Court disagrees. Although the government is entitled to present its side of the story, a factfinder could reasonably infer that the deputy marshals, who had previously used the stairs on numerous occasions, would have noticed the same conditions as the Kankakee officers. Under these circumstances, a reasonable factfinder could conclude from their failure to take the arguably simple step of physically assisting the restrained Gonzalez-Loza down the stairs that the deputy marshals acted with "conscious disregard for the welfare of the plaintiff." *Doe-2*, 593 F.3d at 514.

### 4. Negligent infliction of emotional distress

"Illinois courts treat claims by direct victims of negligent infliction of emotional distress under the same approach used for standard negligence claims." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 703 (7th Cir. 2009). The plaintiff "must

demonstrate a defendant's duty, as well as a breach that proximately caused the claimant an injury." *Id.* The only relevant difference "is that the alleged injury may be solely emotional, rather than physical." *Id.* The government argues that Illinois law requires Gonzalez-Loza to provide evidence of "severe emotional distress." U.S. Mem. in Supp. of Summ. J. at 16. In its reply brief, the government also asserts that this must be "medical evidence." U.S. Reply at 13.

The Seventh Circuit has recognized that Illinois law "makes clear that emotional injuries must surpass a threshold severity to be cognizable." *Lewis*, 561 F.3d at 707. To survive summary judgment, a plaintiff must provide some evidence of a "severe emotional injury." *Id.* at 708 (concluding that plaintiff's "mild anxiety" was not sufficiently severe to support her negligent infliction of emotional distress claim). "The intensity and duration of the distress are factors to be considered in determining the severity." *Pub. Fin. Corp. v. Davis*, 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767 (1976). But the Illinois Supreme Court has expressly concluded that there is no requirement that this evidence must be "medical" in nature. *See Thornton v. Garcini*, 237 Ill. 2d 100, 108, 928 N.E.2d 804, 809 (2010) ("The absence of medical testimony does not preclude recovery for emotional distress."). In addition, the Illinois Supreme Court has held that "expert testimony, while it may assist the jury, is not required to support a claim for negligent infliction of emotional distress." *Id.* at 109, 928 N.E.2d at 809. That is because, in some cases, "the jury could reasonably find that the circumstances of this case caused plaintiff emotional distress" solely "based on personal experience." *Id.*

The question thus is whether Gonzalez-Loza has presented any evidence that would permit a finding that he suffered severe emotional distress as result of the deputy

marshals' conduct.  There is no such testimony in his deposition.  That leaves only an affidavit in which he states that he "ha[s] been suffering from depression," "crying and feeling hopeless," and that he "ha[s] suffered and continue[s] to suffer from constant pain, serious depression, and emotional distress."  Pl.'s Decl. at 4.  Gonzalez-Loza's affidavit does only the bare minimum to describe his emotional injuries.  But the Seventh Circuit has said in the context of emotional distress claims that "claims of even arguable merit must be given to the [factfinder] to consider."  *Lewis*, 561 F.3d at 708.  Summary judgment is appropriate only if "a claim for negligent infliction of emotional distress so clearly falls below the threshold requirement of a severe emotional injury."  *Id.*  The Court cannot say that Gonzalez-Loza's allegations, if credited, that he has suffered from constant crying, hopelessness, and depression clearly fall below that standard.  Specifically, his assertion that he has suffered from "serious depression" throughout the years since the incident suggests an injury that is greater in duration and severity than conditions such as "mild anxiety," "nervousness and sweaty palms," "fear of heights," "crying, sleeplessness, increased migraine headaches, and upset feelings" that courts have found insufficient.  *Id.* at 707–708.

The government argues that the affidavit is inadmissible because it is written in English without any certificate of translation or an original Spanish-language copy, despite the fact that Gonzalez-Loza asserts that he speaks only Spanish.  *See Trapaga v. Cent. States Joint Bd. Loc. 10*, No. 05 C 5742, 2007 WL 1017855, at *8 (N.D. Ill. Mar. 30, 2007) (striking affidavits that contained no "translator's verification or other indication that the testimony was accurately translated" from affiants' native language from the record at summary judgment).  Because the government raised the issue of admissibility

in its reply brief, Gonzalez-Loza has not had a formal opportunity to respond to the argument. The Court orders Gonzalez-Loza to respond to the government's evidentiary argument and/or rectify the issue the government has identified by no later than thirty days after entry of this decision. If he fails to do so, the Court will strike the affidavit from the record, and the government will be entitled to summary judgment on his negligent infliction of emotional distress claim. *See Lewis*, 561 F.3d at 704 ("To defeat a summary judgment motion . . . a party may rely only on admissible evidence.").

### 5. Intentional infliction of emotional distress

Under Illinois law, the tort of intentional infliction of emotional distress has three elements. "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either *intend* that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause *severe* emotional distress." *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 268–69, 798 N.E.2d 75, 79–80 (2003). The "extreme and outrageous" standard is a high bar. The conduct involved must be "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 438 (7th Cir. 2009) (quoting *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 21, 607 N.E.2d 201, 211 (1992)).

Assuming that Gonzalez-Loza is able to provide admissible evidence that he suffered severe emotional distress as a result of the incident, his claim for intentional infliction of emotional distress still cannot succeed. Although the deputy marshals' conduct might be viewed as dismissive of or indifferent to Gonzalez-Loza's safety, there

is no evidence that they intended to cause him severe emotional distress.[5]  To the contrary, their response to the incident suggests that they attempted to mitigate Gonzalez-Loza's injuries after the fall, not prolong or exacerbate them.  In particular, they immediately helped him up and called for medical attention.  The Court concludes that no reasonable factfinder could find that the deputy marshals' conduct meets the "extreme conduct" requirement for this claim.

### 6.    Battery

Finally, Gonzalez-Loza alleges that Burton and Stenson committed battery when they picked him up after he fell.  "Under Illinois law, battery is the 'unauthorized touching' of another that 'offends a reasonable sense of personal dignity.'" *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008) (quoting *Cohen v. Smith*, 269 Ill. App. 3d 1087, 1090, 648 N.E.2d 329, 332 (1995)).

Nothing in the record suggests that the deputy marshals' contact with Gonzalez-Loza was unauthorized.  Gonzalez-Loza contends that he told the officers on the scene not to touch him.  Even so, that is insufficient to permit a finding that the deputy marshals' contact was unauthorized.  Gonzalez-Loza was detained in the deputy marshals' custody; they were not required to follow his instructions.  As Gonzalez-Loza himself argues, they were responsible for his safety and well-being as well as that of the others in the area.  There can be no genuine dispute that the deputy marshals were authorized to come to Gonzalez-Loza's aid and to move him off the floor and into a

---

[5] Gonzalez-Loza's complaint alleges that "one or more U.S. Marshals agents mocked" him.  Compl. ¶ 24.  But he does not renew this contention in his opposition to the government's motion for summary judgment, nor does he provide testimony or other evidence that mocking or other inappropriate commentary occurred.

seated position while they sought medical attention.

Moreover, the record is insufficient to show that the deputy marshals' contact with Gonzalez-Loza would "offend a reasonable sense of personal dignity." Gonzalez-Loza does not dispute that they sought to help him after his fall, not to harm or humiliate him. In sum, there is no evidence that would permit a factfinder to conclude that the deputy marshals committed battery when they lifted Gonzalez-Loza off the ground after he fell.

### Conclusion

For the foregoing reasons, the Court denies the Kankakee defendants' motion for summary judgment [dkt. no. 142] on Gonzalez-Loza's failure-to-protect claim against Senesac and Bartucci (Count 1) but grants their motion for summary judgment on all remaining claims against them (Count 1 and Count 2). The Court denies the United States's motion for summary judgment [dkt. no. 48] on Gonzalez-Loza's negligence claim under the FTCA (Count 1), but grants summary judgment in favor of the United States on the claims for intentional infliction of emotional distress (Count 2) and battery (Count 4). As discussed, the Court directs Gonzalez-Loza to respond to the United States's argument regarding the admissibility of his affidavit and/or remedy the alleged deficiencies by no later than October 23, 2023 so that the Court may make a final ruling on the negligent infliction of emotional distress claim (Count 3). If the plaintiff fails to do so, the Court will strike the affidavit and grant summary judgment in favor of the United States on that claim. The Court sets both cases for a telephonic status hearing on October 3, 2023 at 9:15 a.m. to set a trial date (which the Court assumes will be a combined jury trial on the section 1983 claims and bench trial on the FTCA claims) and discuss the possibility of settlement. The following call-in number will be used: 888-

684-8852, access code 746-1053.

MATTHEW F. KENNELLY
United States District Judge

Date: September 22, 2023